FILED
2017 MAR 8 PM 1:50
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| OMEGA FOREX GROUP, LC, by and through Robert K. Flath, a Partner other than a Tax Matters Partner,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | **MEMORANDUM DECISION**<br><br>Case No. 2:14-CV-00915-BSJ<br><br>District Judge Bruce S. Jenkins |

This matter came before the court for bench trial, beginning on February 6, 2017 and continuing through February 10, 2017. Michael Black and April Medley appeared on behalf of Omega Forex Group, LC ("Omega Forex"). Landon Yost and Alex Halverson appeared on behalf of the United States.

In the opinion of the Court, the tax returns for the year 1998 and the year 1999 of Robert Flath ("Flath") remain open for the court to consider his use in his returns of pass through losses created by Omega Forex—an entity allegedly engaged in foreign currency speculation and dealt with for tax purposes as a reporting partnership.

The question is whether or not by clear and convincing evidence Flath intended to defraud the United States of rightfully owed taxes for each year.

The short answer as to intent is yes. The reasons are set forth below.

## DISCUSSION

On his 1998 return, Flath claimed a pass through loss of $149,857, passed through by Omega Forex as Flath's share of a $4,698,325 loss allegedly sustained in currency speculation by

Omega Forex.[1] The 1998 K-1 issued by Omega Forex and provided to Flath and the IRS showed his percentage loss to be 3.19%.[2] On its face, the K-1 stated that Flath had contributed capital during 1998 of $200,000. It further showed that his capital account at the end of 1998 was $49,881.[3]

The books and records of Omega Forex for 1998 show a note receivable from Flath of $200,000.[4] Flath denied many times under oath that he ever signed a note.[5] Even if he had, it would be of no moment unless the note had been paid in 1998.[6] It had not. Indeed, the only payment made by Flath relating to his capital contribution was a payment of a $20,000 fee paid to his "tax expert"—Dennis Evanson—to have the opportunity to become a capital contributing member of Omega Forex. When Flath signed his 1998 tax return on March 25, 1999,[7] his purported $200,000 capital contribution used as the basis to allocate his loss was non-existent.

Flath claims to have begun the process of transferring marketable shares of stock with a value of $165,000 to Omega Forex in late December 1998 and that the transfer was ultimately consummated in 1999. The stock, whenever it was transferred, was liquidated in March or April of 1999—not December of 1998. Indeed, while the shares of stock had a value of about $165,000 when they were liquidated, their market value was about $30,000 less in December of

---

[1] *See* Am. Joint Pretrial Order, (CM/ECF No. 80) at 3; Def.'s Trial Ex. 14, at IRS005866.

[2] *See* Def.'s Trial Ex. 14, at IRS005890.

[3] *See id.*

[4] *See* Def.'s Trial. Ex. 15, at DEW24-02-0017-0007.

[5] *See, e.g.,* Def.'s Trial Ex. 66.

[6] *See* Pl.'s Post-Trial Br. RE Intent, filed Feb. 24, 2017 (CM/ECF No. 82) at 18. *See also* United States' Post Trial Br., filed Feb. 24, 2017 (CM/ECF No. 81) at 9-11.

[7] *See* Def.'s Trial Ex. 56.

1998.[8] But what is important is that the $165,000—less a fee to Evanson—by some special form of bookkeeping sleight of hand, ended up in a protector account in a Cayman Island entity called International Capital Group or ICG.[9] Such was controlled by Evanson but subject to the will of Flath.[10] In short, the capital contribution, whenever it was made, passed through to the Cayman Island entity for the benefit of Flath, who suffered no loss at all. Flath kept substantially all of his capital contribution less Evanson's fee. Flath kept close tabs on the Cayman account, energetically looking after it, raising many questions with Evanson, and drawing down from it for stock purchases and other expenses.

After receiving his K-1 for 1998, Flath consulted with Gail Anger, a certified public accountant, to assist him in filing his 1998 return. Flath asserts that he took the deduction for Omega Forex losses in good faith only after counseling with his tax preparer. The practical problem is that the tax preparer was apprehensive about the pass through loss deduction and did not believe the IRS would allow such a loss.[11] Indeed, Gail Anger wrote Flath a letter indicating that he had prepared the 1998 tax return in reliance on Flath's assurance that Flath had at least the amount of the loss deduction at risk.[12] Flath did not tell the tax preparer about a protector account located in the Cayman Islands where $165,000—paid thereafter—would be placed on deposit free from currency speculation and available for use for the purchase of stock shares or

---

[8] *See* Def.'s Trial Ex. 58.

[9] *See* Def.'s Trial Ex. 29.

[10] *See, e.g.*, Def.'s Trial Exs. 31, 33, 34.

[11] *See* Def.'s Trial Ex. 30.

[12] *See id.*

the payment of the more mundane expenses of life such as tuition for a child.[13]

The experience was similar in filing the 1999 tax return. The 1999 K-1 issued by Omega Forex and provided to Flath showed a beginning capital account balance of $49,881 and a capital contribution of $100,000.[14] Flath's percentage of overall loss was 2.4%. On its face, the K-1 showed Flath's share of loss to be $85,793. The balance of Flath's capital account in Omega Forex at the end of 1999 was $64,088.[15] However, Flath's ICG account—the Cayman Island protector account—showed a December 31, 1999 balance of $35,950.20.[16] The initial balance of the ICG account for 1999 had been augmented by periodic transfers from a second Cayman Island company called Commonwealth Professional. Commonwealth Professional purportedly sold insurance to Flath and his endodontic practices a secondary malpractice policy with a monthly premium of $8,000 per month.[17] That monthly premium payment amount, less a fee to Evanson, was periodically transferred to Flath's ICG account. Flath testified at trial that the insurance premium payments were the source of the $100,000 capital contributions referred to in his 1999 K-1 form. Through creative bookkeeping, the insurance premium payments made by Flath's endodontic practices to Commonwealth Professionals ended up, less Evanson's fee, as

---

[13] The timing of Gail Anger's letter to Flath and Flath's ultimate transfer of $165,000 in shares of stock is telling, as it was not until *after* Anger's March 19, 1999 letter stating that he had relied on Flath's assurance that Flath had contributed sufficient amounts to Omega Forex in 1998 that Flath ultimately consummated the stock transfer.

[14] *See* Def.'s Trial Ex. 16, at IRS005919.

[15] *See id.*

[16] *See* Def.'s Trial Ex. 29. The court notes that Exhibit 29 shows a history of Flath's ICG account during 1999. During that year, there was as much as $177,375.15 in his ICG account from various sources. Part was stock proceeds of $165,376.29 less a consultant's fee balance of $2,477.54, augmented by monthly deposits of $7,238.20 labeled "stock dividend." The latter payments were a portion of the $8,000 monthly payments for secondary malpractice insurance less a consultant's fee. One withdrawal for $10,008.50, one for $6,000.00, and one for $10,000 were shown as donations to Children's Charities but were used to pay school tuition for children of Flath. In short, the difference between the largest balance and the year-end balance was used for the benefit of Flath.

[17] Flath's primary insurance policy only cost about $1,400 annually.

4

capital contributions for Flath's personal interest in Omega Forex and as amounts in Flath's ICG account that Flath could continue to draw down upon.

Flath was a college graduate, a retired naval officer of twenty years, and a private dentist with a practice that produced revenues of several hundred thousand dollars per year. Had he made a capital contribution in 1998 of $200,000 to Omega Forex for currency speculation, as noted in the 1998 K-1 provided to him, he would have been aware of it. Had he made a contribution of $100,000 in 1999 to Omega Forex for currency speculation, as noted in the 1999 K-1 provided to him, he would have been aware of it. What he did pay through stock sales, less fees to his tax expert Evanson, ended up on deposit with ICG subject to his control. Flath's "at risk" capital contribution—purportedly lost—was used by him from time to time to buy stocks and to pay family expenses. Flath knew that as well.

Flath asserts he relied on "expert advice"—namely, Evanson and CPAs Gail Anger and Bryce Olson—which negates fraudulent intent. It is a strange form of "expertise" which suggests one may still spend what is lost. Evanson, the "tax expert" on whom Flath purportedly relied, received an initial fee of $20,000 and thereafter was to be paid on a contingency basis. Evanson was to get 20% of all tax savings he provided to Flath.[18] Flath testified at trial that Evanson was to be paid nothing in the event currency speculation produced a profit. In reality, what Evanson was providing Flath was tax deductions purportedly from unsuccessful currency speculations by Omega Forex with a guaranty that money purportedly at risk was not at risk at all. Such is neither tax avoidance nor tax postponement. Evanson as currency speculator sat on both sides of the currency transactions. Flath got his share of losses and Evanson got his fee.[19]

---

[18] *See* Def.'s Trial Ex. 13.

[19] Notably, none of the usual paperwork authored by Evanson was ever asked for from Flath or completely filled out by either Omega Forex or Flath. *See* Pl.'s Trial Ex. 225.

As to CPAs Gail Anger and Bryce Olson, expertise of tax preparers depends on accurate and complete information—all necessary information—from the filer.[20] Flath did not so supply. Finally, as to the purported "tax opinion" summary of Pillsbury and Madison,[21] it did not relate to Omega Forex and does not help Flath.

## CONCLUSION

In its petition, Omega Forex asks that (1) Flath be refunded the $93,687 remitted pursuant to 26 U.S.C. § 6226; (2) the court determine that the 1998 and 1999 Notice of Final Partnership Administrative Adjustments ("FPAAs") are invalid, or that the adjustments therein, including penalties and interest, be determined to be without basis in law and fact and therefore incorrect, and that the Form 1065s filed by Omega Forex for 1998 and 1999 be determined to be correct as filed as to Flath; and (3) that Omega Forex is entitled to recover cost and attorney's fees.[22]

The court DENIES Omega Forex's petition for relief. Instead, for the reasons described above, the court finds in favor of the United States. The court upholds the adjustments in the Omega Forex FPAAs that disallow the fraudulent Section 988 losses, determines that the fraud penalty is applicable to such losses, and finds that the statute of limitations as to Flath is still open to make the assessments relating to such adjustments.

Let judgment be entered accordingly.

DATED this __8th__ day of March, 2017.

Bruce S. Jenkins
United States Senior District Judge

---

[20] Plaintiff acknowledges as much in citing to the Tenth Circuit's decision in *Davis v. C.I.R.*, 184 F.2d 86, 88 (1950), which likewise expected taxpayers to make "a full disclosure" and provide "all necessary information" to their tax preparers. *See* Pl.'s Post-Trial Br. RE Intent, filed Feb. 24, 2017 (CM/ECF No. 82) at 6.

[21] *See* Def.'s Trial Ex. 22.

[22] *See* Petition for Readjustment of Partnership Items Under Internal Revenue Code Section 6226, filed Dec. 18, 2014 (CM/ECF No. 2) at 8 of 9.